**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 19-20400 (JJT) |
| | ) | | |
| DONNA J. BARNES, | ) | | |
| DEBTOR. | ) | CHAPTER | 11 |
| | ) | | |
| DONNA J. BARNES, | ) | ADV. PRO. NO. | 19-02025 (JJT) |
| PLAINTIFF | ) | | |
| | ) | | |
| V. | ) | RE: ECF NOS. | 8, 14, 30, 80, 86, 87, |
| | ) | | 89, 96, 134, 135 |
| JAMES R. BARNES, | ) | | |
| UBS BANK, USA, | ) | | |
| SHEM CREEK HAYSTACK, LLC, | ) | | |
| RTM CAPITAL PARTNERS, INC., | ) | | |
| LPV-15, HERMITAGE, LLC, | ) | | |
| MATTHEW CURTIS, | ) | | |
| DANIEL SOLAZ, | ) | | |
| REINHART FOODSERVICE, LLC, | ) | | |
| MARK BRETT, | ) | | |
| LH VT HOUSE, LLC, | ) | | |
| DEFENDANTS. | ) | | |
| | ) | | |

**MEMORANDUM OF DECISION APPROVING**
**REAL PROPERTY SALE FREE AND CLEAR OF LIENS, CLAIMS,**
**INTERESTS AND ENCUMBRANCES AND AUTHORIZING CLOSING**

## I.    INTRODUCTION

Currently before the Court is the Debtor-Plaintiff's Amended Complaint

Seeking Approval of Sale of Both Interests of Debtor's Estate and of Co-Owner, Free

and Clear of Liens, Claims, Interests and Encumbrances Asserted Against the

Property (the "Complaint," ECF No. 8), which was filed on October 31, 2019,[1] as the

---

[1] The original complaint was filed on October 4, 2019.

primary vehicle for the Debtor's reorganization efforts under Chapter 11 of the Bankruptcy Code. A trial on the Complaint was held on April 3 and 6, 2020 ("Trial") to approve the Property's Sale for $10,403,000 and the transfer of title to Nancy Du ("D-Trust"), the highest bidder at the Court approved auction held on March 7, 2020.[2]

The Debtor filed for Chapter 11 protection on March 14, 2019, in order to avoid an imminent foreclosure sale of the subject Property. *See* Main Case No. 19-20400, ECF No. 1. The Property at the center of the foreclosure, and at the center of the Complaint, is a luxury single-family residential home with a standalone cottage, boat house, dock, pool, and tennis court on a 2.74 acre waterfront lot located at 33 Bay Street, Watch Hill, Westerly, Rhode Island 02891 (the "Property") held jointly by the Debtor and the Debtor's Spouse, James R. Barnes ("Mr. Barnes"), as tenants by the entirety. The Property is encumbered by tax liens, a first and a second mortgage, as well as an assortment of liens that are held by creditors of Mr. Barnes.

The Complaint seeks to sell the Property, pursuant to 11 U.S.C. §§ 105, 363(b), 363(f) and 363(h), and "that such sale be authorized free and clear of any and all liens, claims, interests and encumbrances" (collectively "Liens," ECF No. 8) asserted against the Property so that the Debtor's estate may realize the Debtor's share in the Property and fund her Chapter 11 Plan (ECF No. 25). Throughout the Debtor's bankruptcy, creditors of Mr. Barnes, Reinhart Foodservice, LLC

---

[2] The following four Defendants were issued a Notice of Default by the Bankruptcy Court Clerk's Office and provided notice of the Clerk's Entry of Default for failing to answer the Complaint: James R. Barnes, USB Bank, USA, Daniel Solaz, and Mark Brett. Default Judgments have now entered against these parties. All parties were provided subsequent notice of the Trial. *See* Certificate of Notice, ECF No. 149. Of the defaulted Defendants, only Mr. Barnes appeared at the Trial, where he affirmatively consented to the Sale.

("Reinhart") and LH VT House, LLC ("LH") (collectively, the "Objectors"),[3] have challenged both the legal sufficiency of the Complaint (*see* ECF Nos. 17 and 18 respectively, "Motions to Dismiss") and the factual predicates alleged by the Debtor that would permit her to sell the Property free and clear pursuant to 11 U.S.C. §§ 363(b), (f) and (h) (*see* ECF Nos. 134 and 135, "Amended Answers"). In-so-far as the Objectors are seeking, in part, a reconsideration of their arguments set forth in their Motions to Dismiss, the Court addressed and rejected those arguments in its Ruling and Memorandum of Decision Denying Defendants' Motion to Dismiss (ECF No. 36). Accordingly, under Federal Rule of Civil Procedure 59 and 60, the Court declines to find cause to entertain reconsideration and thereby revisit its Ruling here.

With respect to the sufficiency of the underlying facts adduced at Trial, LH argues that the Court should not confirm the Sale because it resulted in a "grossly inadequate" price due to poor marketing and the sudden downturn in market conditions, occasioned by the Covid-19 pandemic,[4] and that if the Property was properly marketed a second time by its global real estate broker, it would garner a significantly greater price, thus, providing a better recovery for the creditors of the Debtor. Through its papers, exhibits and expert testimony, LH argued at Trial that the Property's true value is approximately $14,000,000 because trophy real estate,

---

[3] LH belatedly filed a proof of claim against the Debtor's estate claiming that she is liable to LH by virtue of the receipt of fraudulent transfers from Mr. Barnes (Case No. 19-20400, ECF No. 249). The motion to allow the late filed claim has not yet been heard or decided by the Court.

[4] At the time of the Trial, New York City was on the verge of the peak of its pandemic curve and Rhode Island and Connecticut were under executive orders from their respective governors to "stay at home." *See* https://portal.ct.gov/Office-of-the-Governor/Governors-Actions/Executive-Orders/Governor-Lamonts-Executive-Orders, and http://www.governor.ri.gov/newsroom/orders/. The Court has also taken judicial notice of stock market volatility during the relevant period.

such as this Property, will likely retain value during times of economic uncertainty, and due to the "spectacular" character and prestigious location of the Property, the market for this home was national in scope, if not international. Consistent therewith, LH's real estate marketing expert, Josh Altman, suggested—without data or an expert report and in self-confident and conclusory fashion—that with his improved marketing plan, supercharged contacts list, and novel outreach strategy a better outcome was substantially likely. Lastly, Reinhart argues (as it did in its Motion to Dismiss [ECF No. 17]) that, even if the Court hypothetically could approve the sale, the Debtor is unable to satisfy the factors listed in 11 U.S.C. § 363(f), as a matter of law, and, therefore, this Court is without authority, by virtue of Rhode Island law on tenancies by the entireties, to authorize the sale. The Debtor and RTM Capital Partners, Inc.,[5] ("RTM") filed responsive papers to these objections (*see* ECF Nos. 134 and 135) and in support of the Sale.

## II.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings pursuant to 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1), and the General Order of Reference of the United States District Court for the District of Connecticut, dated September 21, 1984. This Adversary Proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).

---

[5] RTM Capital Partners, Inc., LPV-15, Hermitage LLC, and Matthew Curtis will collectively be referred to as "RTM" throughout this Decision.

4

III.    FINDINGS OF FACT

Having considered the evidence in the record concerning the relief sought and all of the pleadings and briefs filed by the Debtor and the Defendants, as well as the arguments presented during the Trial, and after due deliberation and for good cause shown, the Court

HEREBY FINDS, ADJUDGES AND DETERMINES THAT:

1. Under the circumstances of this Chapter 11 bankruptcy case and proceeding, notice of the Complaint and auction sale was adequate, sufficient, and complied with the various applicable requirements of the Bankruptcy Code, the FRBP, the Court's local rules, and the procedural due process requirements of the U.S. Constitution. All parties-in-interest were afforded a reasonable opportunity to bid in the auction, and to object or to be heard with respect to the Complaint, the Sale Agreement, the Sale, and the Proposed Judgment.

2. The Debtor's prior frustrated sale efforts, her significant financial difficulties, family disruptions, and a present inability to maintain her mortgage obligations or to meet the maintenance requirements of the Property, in addition to her inability and illiquidity to maintain those obligations in the future, created materially adverse perils for the Property and her Chapter 11 case. She therefore advanced sound business reasons for the proposed transaction.

3. The D-Trust proceeded in good faith in all respects connected to the sale process, this proceeding, and the Sale Agreement, which has been negotiated,

5

proposed, and entered into by both parties without collusion or fraud, in good faith, and from an arm's length bargaining position.

THE SALE

4.  On September 30, 2019, the Court approved the Debtor's engagement of Lila Delman Real Estate as a broker to market the Property. This engagement included an exclusive right to sell listing agreement with a listing price for the Property of $16,750,000. Delman, a highly regarded and leading broker in the Watch Hill community, marketed the Property in customary fashion for a home of this quality for a period of 61 days but generated no serious offers, largely because of the looming prospects of a bankruptcy auction.

5.  On January 22, 2020, without meaningful objection from the Defendants, the Court approved the Debtor's employment of J.J. Manning, Inc. ("J.J. Manning"), an equally accomplished, experienced and highly respected regional real estate brokerage and auction firm, to list, market extensively, and sell at auction the Property under customary terms, utilizing various mixed media marketing strategies delineated in the marketing plan, and other accepted practices.[6] That engagement set the marketing plan for the Property over 6 weeks and provided a minimum bid of $8,000,000, which was unopposed by the Objectors prior to the auction.[7]

---

[6] J.J. Manning had been enlisted to sell the Property in the aforementioned Shem Creek state court foreclosure proceeding against the Debtor and her non-debtor spouse. Its extensive marketing of the Property in various media formats, and the responsive interest it evoked, were delineated in its Final Auction Report (*see* Plaintiff Exhibit 23). In total, the Property experienced 4.3 months (or 130 days) of market exposure if one counts the prior foreclosure process.

[7] The Court notes that both Reinhart and LH participated in some fashion in the drafting of the bidding procedures proposed by the Debtor and failed to object to said procedures once properly before the Court.

6.  As planned, J.J. Manning fronted approximately $10,000 in marketing costs in order to extensively market the Property over a period of 6 weeks in preparation for the on-site inspections and auction, because the Debtor could not afford to do so. The auction ultimately was conducted on March 7, 2020, at the Property and involved multiple qualified bidders, the large majority of which were from out of state.[8]

7.  J.J. Manning is an experienced and recognized broker by the bankruptcy courts and is both knowledgeable about the Property, the Watch Hill community and the demographics of prospective buyers who would likely be in the market for a second or third home and who could qualify as potential buyers. J.J. Manning conducted a professional, reasonably calculated, and competitive auction that yielded an offer which is representative of fair value for the Property.[9]

8.  To qualify as an eligible bidder, an interested party was required to demonstrate an ability to immediately tender: (1) $250,000 in good funds, payable to J.J. Manning, and (2) a letter from a bank president, or upper level management equivalent, indicating that the interested party had the financial wherewithal to consummate the contemplated transaction, which required a minimum of $8,000,000, in the event the party prevailed at the

---

[8] Nine states were represented in the pool of interested parties that contacted J.J. Manning with respect to the sale.
[9] According to testimony from Mr. Scotti, high-end Watch Hill homes were largely owned by wealthy individuals from Connecticut, New York, and Massachusetts (see LH Ex. 2, p. 92) ("There are few transactions annually in Watch Hill as many of the properties are passed down from generation to generation. The typical Watch Hill buyer is not a Rhode Island native[,] with most buyers coming from greater Boston, New York, and Philadelphia. Watch Hill is considered to be one of the East Coast's most desirable summer communities."). As target buyers, these constituents appear to have been appropriately identified and marketed to by J.J. Manning, in addition to countless others who had access to the media advertisements and solicitations.

sale. The bidder qualification process ensured that the bidders present at the auction were serious and could readily and reliably close on the sale.

9. After several rounds of bidding, the successful bidder at the auction bid $10,300,000 for the Property, which resulted in an ultimate sale price of $10,403,000, while the backup bidder at the auction bid $10,100,000 for the Property.[10] It was neither unanticipated nor irregular that bidders at a bankruptcy auction of this "As Is" Property would seek to buy the property at some discount.[11] Reinhart and LH, however, did not bid at the auction.

10. This purchase price nonetheless represents fair value produced in a regularly conducted sale and is within the range of reasonable and fair value under the circumstances. Critically, the Sale here permits the Chapter 11 bankruptcy estate to fully satisfy secured and administrative claims and also provide a full payment to undisputed unsecured creditors. Should the Debtor prevail in her claim to half of the net proceeds, it will also fund her "fresh start."

---

[10] Both bids were subject to a 1% broker's premium which is to be paid by the buyer and which is factored into the final sale price. Importantly, that premium was calculated to induce outside brokers to expose the Property to their array of prospective buyers throughout the country.

[11] *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537–39 (1994) (Scalia, J.) ("In short, 'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale. . . . An appraiser's reconstruction of 'fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that must be sold within those strictures is simply worth less. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques. And it is no more realistic to ignore that characteristic of the property (the fact that state foreclosure law permits the mortgagee to sell it at forced sale) than it is to ignore other price-affecting characteristics [such as the fact that state zoning law permits the owner of the neighboring lot to open a gas station].").

11. The Sale Agreement contains reasonable, customary, and favorable terms for an "As Is" sale, notwithstanding the structure's age and condition, and the additional limitations imposed by the bankruptcy process.

12. Further, the disposition and closing of this transaction mitigates the risks that the Chapter 11 bankruptcy estate will be unable to fund, operate, or sufficiently maintain the Property, its grounds or its mechanical systems in good order throughout the pendency of this case.

13. Further, the Sale averts a potential foreclosure sale by the mortgage lenders which would likely yield a less favorable outcome to this estate, only to be saddled with substantial additional transaction costs, interest accruals, and legal fees.

14. The auction took place on a bright and clear day during the early stages of the Covid-19 pandemic in the Northeast; and before business closings, significant stock market declines and the cessation of travel, business and regional commerce as communities were urged to "stay at home."

15. In the face of Covid-19 lockdowns, the subsequent financial volatility of the stock market and the uncertain depths of the resultant national financial crisis, a remarketing and resale of the Property, logically and foreseeably, is merely an invitation to assure a lost sale to the D-Trust, enhanced transaction costs and an uncertain outcome as real estate markets shutdown or reel to predict the future, and various investors start to quantify their losses.

## LIENHOLDER INTERESTS

16. Shem Creek and RTM have consented to the Sale and the Closing under 11 U.S.C. § 363(f), subject to retaining their rights and priorities to sale proceeds. Municipal/real estate tax lienors, UBS and Shem Creek will be paid in full by this sale. RTM has consented even though it will likely be paid a fraction of its approximately $6,000,000 claim because it believes fair value has been realized for the Property.

17. The following Defendants were provided Notice of Default: James R. Barnes, USB Bank, USA, Daniel Solaz, and Mark Brett. Default or Consent Judgments have subsequently entered against them.

18. The interests of Reinhart and LH are, at a minimum, subject to a bona fide dispute under 11 U.S.C. § 363(f)(4) (see this Court's Ruling and Memorandum of Decision Denying Defendants' Motion to Dismiss, ECF No. 36). Specifically, the issue of whether their liens attach to the half of the net sale proceeds claimed by Mrs. Barnes or are otherwise enforceable against her estate. This is a bona fide and material dispute, which is further confused by the dearth of Rhode Island law on such priority disputes in the context of a bankruptcy sale of an interest held by tenants by the entireties.[12]

19. Furthermore, Reinhart and LH could be compelled to accept a money satisfaction of their liens if the Sale proceeds are otherwise sufficient to

---

[12] Critically, Reinhart argues as one of its affirmative defenses that "[o]ne or more of the liens granted by the Debtor on the Property is void or avoidable for lack of consideration, or under other grounds, for the granting of a lien in her interest due to the allegations that all the proceeds of the purported loans were provided to the Co-Owner's business entities." Accordingly, by Reinhart's own admission, there is a bona fide dispute as to the underlying validity of certain interests that have attached to the Property.

satisfy all bona fide liens prior in right under 11 U.S.C. § 363(f)(3). *See* 11 U.S.C. § 363(f)(5). For example, in the event of a Rhode Island foreclosure sale, like the one that was stayed by this bankruptcy, Reinhart and LH could be compelled to accept money satisfaction of their interest assuming some portion of Reinhart and LH's liens were in the money.[13]

20. The prospect for a partition in kind of the Property among the Debtor's estate and Mr. Barnes is impracticable. Mr. Barnes is otherwise unable to purchase the Property at the price at which the sale of the Property is to be consummated and the Property is not amenable to division.

21. The sale of the Debtor's undivided interest in the Property, by virtue of her title, as a tenant by the entirety, without the sale of Mr. Barnes' interest would not be permitted under Rhode Island law, and to the extent that it could be permitted, the sale of the estate's undivided interest in the Property would indisputably realize significantly less benefit for the estate than the sale of the Property free and clear of interest of both co-owners.

22. The benefit to the estate of a sale of the Property free of the interest of Mr. Barnes and his lien creditors outweighs the detriment, if any, to that of co-owner and lienholders. In fact, such a sale allows each co-owner to monetize their positions to satisfy creditors.

---

[13] The Court notes that this state court foreclosure sale would likely resume promptly in the event the Debtor's Plan was not confirmable or if Shem Creek sought relief from stay. This course of sale was also bargained for with creditors by Mrs. Barnes to stave off stay relief, dismissal or conversion of this case in order to avoid foreclosure.

23. If the Debtor is not permitted to sell the Property free and clear of Mr. Barnes' interest and the attaching liens, it is likely that the Debtor will not have any realistic prospect of reorganization or a chance of garnering a more favorable financial outcome.

24. Except as otherwise provided in the Motion, the Property shall be sold, transferred, and delivered to D-Trust at the Closing on an "As Is, Where Is" or "With All Faults" basis. Further, the Sale contemplates no financing contingency, no representations (other than those contained in the Warranty Deed) no inspection rights, no escrows or adjustments for conditions of the Property. In effect, the Sale does not have all the attributes of a non-distressed disposition sold at leisure.

25. Accordingly, this Court adjudges, based upon the record, the 11 U.S.C. §§ 363(f)[14] and (h)[15] provisions have been satisfied, and the Property may be transferred to D-Trust at Closing, upon satisfaction of the conditions provided for in this Order and the Sale Agreement, free and clear of the following Liens:

---

[14] 11 U.S.C. § 363(f) allows a trustee to sell a property "free and clear of any interest in such property of an entity other than the estate," only if one of the following five subparagraphs of that section apply: (1) applicable non-bankruptcy law permits the sale free and clear; (2) the entity with the interest consents; (3) the interest is a lien and the sale price is greater than the aggregate value of all liens on the property; (4) the interest is in bona fide dispute; or, (5) the entity could be compelled to accept money satisfaction of the interest in a legal or equitable proceeding.

[15] 11 U.S.C. § 363(h) provides that: "Notwithstanding section (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if–(1) partition in kind of such property among the estate and such co-owners is impracticable; (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners; (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power."

a. Any interest Mr. Barnes may have had with respect to the Property, be it as a tenant by the entirety or by any other type of right;

b. Inchoate municipal tax liens, currently exceeding $150,000 plus accrued interest in favor of the Town of Westerly, Rhode Island, for all real estate taxes due and owing;

c. Mortgage from the Debtor and the non-debtor spouse to USB in the original amount of $2,000,000, which is dated December 24, 2013 and recorded on December 30, 2013, in Book 2013 Page 27048 of the Westerly, Rhode Island, Land Records;

d. Mortgage from the Debtor and the non-debtor spouse to Shem Creek in the original amount of $3,500,000, which is dated and recorded on September 20, 2016, in Volume 2016, Page 15981 of the Westerly, Rhode Island, Land Records;

e. Writ of Execution in favor of RTM Capital Partners, Inc., against James R. Barnes in the amount of $6,285,173.17 dated August 23, 2018 and recorded September 5, 2018 in Book 2018 at Page 14606 of the Westerly, Rhode Island, Land Records;

f. Writ of Execution in favor of Daniel Solaz against James R. Barnes in the amount of $320,917.16 dated November 15, 2018 and recorded November 16, 2018 in Book 2018 at Page 19683 of the Westerly, Rhode Island, Land Records;

g. Writ of Execution in favor of Reinhart Foodservice, LLC, against James R. Barnes in the amount of $1,592,280.19, and which was recorded on December 14, 2018 in Book 2018 at Page 21361 of the Westerly, Rhode Island, Land Records;

h. Certificate of Attachment in favor of Mark Brett filed against James R. Barnes in the amount of $350,000.00 dated February 18, 2019 and recorded March 1, 2019 in Book 2019 at Page 3023 in the Westerly, Rhode Island, Land Records; and

i. Writ of Execution in favor of LH VT House, LLC against James R. Barnes in the amount of $1,182,639.80 dated March 6, 2019 and recorded March 12, 2019 in Book 2019 at Page 3907 of the Westerly, Rhode Island, Land Records.

26. Unless the Lien holders have agreed to other treatment, any party holding a right, lien, claim, interest or encumbrance on the Property is granted a replacement right, lien, claim or interest in the sale deposit and Closing proceeds to the extent, priority and validity to be determined by a subsequent order of this Court, with all parties reserving their rights until such a determination.

VALUE

27. This Court finds that regardless of whether the sale price is evaluated by examining the regularity of the sale process, or the valuations advanced by credible and reliable professionals, the bids under the Sale Agreement neither shock the conscience nor appear to be grossly inadequate.

28. The Town of Westerly, Rhode Island's most recent tax assessment catalogues the Property at $9,969,000, which the Town of Westerly calculates at 100% of the Property's fair market value.

29. Defendant, Shem Creek, obtained a current appraisal of the Property, which assessed the Property at $9,969,999, along with a broker's price opinion from 2018, which proposed a listing value of $11,800,000;

30. Based on an appraisal performed on March 20, 2020, RTM's expert witness, Thomas Sweeney, opined that the fair market value for the Property at the time of the appraisal was $9,800,000.[16]

31. In contrast, LH's expert witness, Peter Scotti, opined that the Property's fair market value fell roughly between $12,000,000 and $14,800,000. Notwithstanding his range of valuation, he further advanced that the true market value for the Property was closer to $14,000,000. Mr. Scotti testified that this valuation relied principally on *one* sale (of another exceptional

---

[16] In December 2018, prior to the Debtor's bankruptcy, the same appraiser valued the property at $9,000,000. While Mr. Sweeney acknowledged that his valuation was based on an exterior appraisal only that largely utilizes publicly available information on the Land Record or from the Town of Westerly, as well as MLS, the Court notes that his appraisal characterized the exterior as being in "very good" condition. Mr. Scotti later testified that an exterior appraisal is common under certain circumstances, one of which is when the interior of the property is likely to possess the same characteristics as the exterior. Mr. Scotti subsequently testified that the interior condition of the Property was in "excellent to very good" condition, thus, confirming that the interior conditions were comparable to the exterior conditions.

home) out of the four recent and comparable sales in the Watch Hill area that he considered when generating the appraisal. Mr. Scotti acknowledged upon cross examination, however, that his ultimate opinion as to value did not materially incorporate or adjust for the other three sale values which were painstakingly analyzed in the appraisal as comparable properties and which ranged from approximately $10,000,000 to $12,000,000. He simply, in conclusory and dismissive fashion, chose to disregard his own comparable analysis. The one "comparable" sale relied on by Mr. Scotti for the $14,000,000 valuation, however, was for all intents and purposes, a true outlier—one that represented an extraordinary and distinct property on East Beach, near the Ocean House Hotel, which sold for an amount in excess of $17,500,000, and that represented the absolute top end of the market in the area. Guardedly, Mr. Scotti acknowledged that the market comparables were thin with respect to each of the properties selected due to their uniqueness and the absence of significant near-term sales. Furthermore, none of the comparable properties he allegedly relied upon were weighed by the market attributes/stimulus of financial distress in a foreclosure or bankruptcy sale. The Court discounts his testimony and the weight to be accorded to his opinion.

32. Mrs. Barnes Bankruptcy Schedules also advance a credible valuation of the Property (by an owner) of $11,000,000.

UNEXAMINED CIRCUMSTANCES IN THE SCOTTI APPRAISAL

33. The values provided by both live appraisers assumed that market conditions and the marketing periods would not be subject to any undue stimulus.

34. Mr. Scotti testified that a court ordered auction of an encumbered property with a pending foreclosure, bankruptcy, and illiquidity concerns may contain an undue stimulus, which would justify a downward adjustment to his valuation. Mr. Scotti did not, however, adjust for the presence of the aforementioned stimulus in his appraisal.

35. Furthermore, portions of Mr. Scotti's appraisal departed from professional appraisal standards in that it failed to include the presence of certain known undue stimuli that would affect fair market value of the property (such as a lien or pending judicial proceeding), while also failing to state what an appropriate marketing period would be for the Property. When questioned about his level of inquiry into possible encumbrances on the Property, Mr. Scotti testified that he did not make such an inquiry, despite testifying earlier that he had been contacted by LH after the Property has been sold pursuant to a court ordered auction.

36. The current operating expenses associated with the property include interest payments to UBS on its mortgage, interest payments to Shem Creek on its mortgage, insurance premiums, utilities, property taxes, and maintenance costs.

37. Both live appraisers agreed that there was a dearth of reliable information as to what effect the current Covid-19 pandemic would ultimately have on the real estate market. Mr. Scotti testified that, historically, during significant

16

periods of economic downturn or uncertainty, real property values were generally impacted negatively, although high end properties often fared better. His testimony regarding the fate of this Property upon resale during the Covid-19 pandemic or its aftermath was decidedly inconclusive.

38. Accordingly, based upon this record, the Court determines the fair market value of the Property is approximately $11,500,000, in reliance on the cluster of credible valuations within that range and the sale process.

39. LH's marketing expert, Josh Altman, testified that if the Court was to order a second sale, a better outcome was substantially likely because of his signature marketing approach. Mr. Altman, however, is not a licensed Rhode Island real estate broker, is not personally familiar with the Property, is not familiar with the community, and had no professional contacts in Rhode Island to assist him with his marketing analysis regarding the Property.

40. Mr. Altman, who principally casts his marketing strategy as the superlative rolodex model, the effectiveness of which he promotes as being self-evident, was nonresponsive to the Court when ask to explain on why "more is better" as it related to marketing this particular property. Despite Mr. Altman's bona fides as a professional marketer, he could not or would not state in further detail, beyond saying "the more eyes, the better," why a sprawling national and/or international marketing campaign, over a much longer period of time, would yield a better result under the present circumstances for the Property.

41. When asked whether they would post a bond equivalent to the present sale price in order to protect the Debtor's estate in event a second sale did not achieve a greater sale price, or whether they would pay the operating expenses associated with maintaining the property during the pendency of the proposed second sale, LH and Mr. Altman answered in the negative.

42. The Court further finds that the current Covid-19 pandemic creates materially adverse impediments, both logistical, practical and financial, to the active remarketing of the Property and reliable pursuit of a second auction in this bankruptcy proceeding. The Covid-19 adverse stimulus, which may persist for an unpredictable period, is indisputably worse presently than the time and context of this auction sale.

## IV. DISCUSSION

In considering whether a sale can be conducted pursuant to § 363(b), courts must consider the following factors: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). While these factors are not exhaustive, they bear heavily on whether a sale under § 363(b) is appropriate. Here, the Debtor has presented evidence that the sale of the Property in order to fund her Chapter 11 Plan is viable and has demonstrated sound business reasons for the proposed transaction, particularly in light of her illiquidity and the current uncertain market conditions. The Debtor has also presented evidence that the Sale has been proposed

18

and negotiated in good faith, with all parties of interest receiving adequate and reasonable notice under the circumstances. Furthermore, the Debtor, bolstered by supporting parties, has presented evidence that the sale price is fair and constitutes reasonable consideration achieved in a recognized and regularly conducted sale process.

LH has, however, asked this Court to deny the confirmation of the Sale on the basis that the purchase price will not maximize creditor value and is "grossly inadequate," alleging that $10,403,000 does not offer fair value for the Property. LH further argues that if a sale price falls below 75% of the appraised value, it should be considered presumptively inadequate. Critical to this line of argument is LH's presumption that Mr. Scotti's unadjusted valuation opinion of $14,000,000 is a credible benchmark. However, as previously discussed, the Court does not find this value credible due to its over reliance on a single sale that is inarguably an outlier, and one which lacks further adjustment for the presence of undue stimuli. Rather, the evidence presented at Trial suggests that the market value range for the Property likely ranged between $9,500,000 and $11,500,000, as indicated by the cluster of comparable sales, appraisals, and broker listing opinions in this record.

For argument sake, if Mr. Scotti's appraisal of $14,000,000 was a reasonable market value of the Property and that a judicial sale garnered a sale price of less than 75%, courts are nonetheless endowed with significant discretion when confirming a sale. *See Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir.1985) (upholding a bankruptcy court's decision to disregard an appraisal and approve a proposed sale upon a finding that the sale price was "not

19

unreasonable"). Critically, it is generally accepted that the best and truest indication of value is the behavior in the marketplace and the sale process itself. *See, e.g., In re Chemtura Corp.*, 439 B.R. 561, 586 n.106; B*ank of America Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership*, 526 U.S. 434, 457 (1999) (acknowledging "the best way to determine value is exposure to a market" rather than a determination by a bankruptcy judge); *In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("there is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction"); *In re Champion Enterprises, Inc.*, 2012 WL 3778872, at *35 (Bankr. D. Del. Aug. 30, 2012); *In re Chrysler*, 405 B.R. 84, 98 (Bankr. S.D.N.Y. 2009) ("the true test of value is the sale process itself").

The simple fact is that Objectors have not met their burden of proof with respect to their Objections.[17] What is more, LH acknowledges that the Court, when considering whether to confirm or deny a sale has to consider whether "*there is a reasonable degree of probability that a substantially better price will be obtained by a resale. . . .*" *In re Blue Coal Corp.*, 168 B.R. 553, 561 (Bankr. M.D. Pa. 1994). Perhaps on the sunniest of summer days, when potential buyers would be wearing not just dark tinted glasses, but rose-colored ones as well, such circumstances may converge to yield a substantially higher sale price. However, absent the presence of such optimal conditions, and given the administrative expense burn rate and the Debtor's

---

[17] It is noteworthy that even with a gross value of $14,000,000, it is unlikely the LH will be in the money. Its role as a "spoiler," however, may serve to leverage settlement pressures. Interestingly, the party that is most likely to benefit by an enhanced sale price is RTM. RTM, however, supports this sale and rejects a remarking effort as a gamble with its money. As previously stated in this Decision, LH is not willing to backstop a resale effort with a bond, purchase agreement or funds to address the "burn rate" for the proposed 6-month marketing period.

corresponding inability to cover those administrative costs, the stayed state court foreclosure, the major economic disruptions caused by the Covid-19 pandemic, and the logistical and health concerns associated with attempting to re-market and auction a substantially encumbered trophy property under the present circumstances, the Objectors claims are simply not founded in credible evidence or common sense. Most importantly, they are not founded upon any admissible testimony or recognized empirical data from Mr. Altman or anyone else. There is no evidence that a bigger broker platform that afforded more marketing, more time and more media exposure in this market assures a markedly improved net outcome with any reasonable degree of certainty. Smart, wealthy buyers will likely be smart-wealthy buyers whether from Boston or Miami. In this context, they can be trusted to be value oriented and careful. Having concluded that the Debtor established a valid business justification for proceeding with the Sale and the purchase price being fair and reasonable, the Court has broad discretion to approve the Debtor's section 363 Sale where the price and process are fair. *See In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983). LH's objection is hereby **OVERRULED**.

Lastly, Reinhart Objects to the Sale arguing that Debtor failed to prove that it could meet any of the § 363(f) prongs. Specifically, Reinhart argues that applicable non-bankruptcy law does not permit the sale free and clear, *see* § 363(f)(1), that it expressly does not consent to the sale, see § 363(f)(2), and the plaintiff has failed to prove § 363(f)(3) ("the interest is a lien and the sale price is greater than the aggregate value of all liens on the property"); § 363(f)(4) ("the

interest is in bona fide dispute"); or § 363(f)(5) ("the entity could be compelled to accept money satisfaction of the interest in a legal or equitable proceeding").

As the Court addressed in its Ruling and Memorandum of Decision Denying Defendants' Motion to Dismiss (ECF No. 36), "the parties to this matter have effectively conceded in arguments before the Court that the nature, validity, extent, priority, and enforceability of their liens against the non-debtor interests on the Property are subject to a bona fine dispute as a matter of law." *See also* Part III, ¶18 of this Decision. In the present case, the Debtor has satisfied her burden under §§ 363(f)(1), (f)(4) and (f)(5). Accordingly, Reinhart's objection is hereby **OVERRULED**.

BASED ON THE FOREGOING, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1. The Debtor is authorized and directed to take any and all customary actions reasonably necessary or appropriate to: (a) promptly consummate the Sale transfer to D-Trust according to the Contract and this Order; (b) perform, consummate, implement, and close fully on the Sale referenced within the Sale Agreement and undertake any action that may be reasonably customary, necessary, or appropriate to implement this Order and the Sale Agreement; and (c) perform the obligations contemplated by this Order and the Sale Agreement, including all actions consistent therewith as reasonably requested by D-Trust in regard thereto.

2. Time is of the essence. The Closing of the Sale may be conducted on or about April 14, 2020, pursuant to the First Amendment to Single Family Purchase

and Sale Agreement ¶ 1 (ECF No. 139), unless mutually extended by the Debtor and D-Trust in a further extension to midnight April 30, 2020.

3.  D-Trust's nonrefundable $1,040,300 earnest money deposit ("Deposit"), as represented at the Trial and as set forth in the Sale Agreement, is hereby recognized and approved. The Debtor shall retain the Deposit as liquidated damages should the Sale fail to close due to D-Trust's default. D-Trust's remedies upon the Debtor's default are as specified in the original Sale Agreement ¶ 19.

4.  The Court authorizes the Debtor to sell the Property to Jodi L. Oh as a backup buyer for the backup bid price of $10,201,000, pursuant to the terms and conditions of this Order, or its subsequent modification, should D-Trust fail to timely consummate the Sale.

5.  In the event that neither party closes this Sale, the Debtor shall file a "Certificate of No Closing" upon this Court's docket within three (3) business days of the last scheduled Closing date.

6.  Pursuant to 11 U.S.C. § 363, FRBP 7070, and Federal Rule of Civil Procedure 70, as of the Closing, this Order shall divest the Co-owner, the Debtor and her Chapter 11 bankruptcy estate of all right, title, and interest in and to the Property.

7.  The Sale contemplated by the Sale Agreement and the Order has been undertaken by the D-Trust in good faith, as defined under 11 U.S.C. § 363(m), and therefore, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect its

validity unless such authorization is duly stayed pending such appeal before the Closing. D-Trust is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

8.  The D-Trust is not a successor to the Debtor or her Chapter 11 bankruptcy estate by reason of any theory of law or equity, and D-Trust shall not assume, or in any way be responsible or liable for, any liability or obligation of the Debtor or her Chapter 11 bankruptcy estate, except as otherwise expressly provided in the Sale Agreement, a closing document, or this Order.

9.  The Debtor, and any escrow agent, upon the Debtor's written instruction, shall be authorized to make such disbursements at the Closing of the Sale as are required by the Sale Agreement and this Order, including, but not limited to: (a) all pre-petition municipal/real estate taxes and outstanding post-petition municipal/real estate taxes pro-rated as of the Closing related to the Property; (b) all state or local conveyance fees or taxes, transfer fees or taxes, and any customary closing costs and expenses associated with the Property Sale; and (c) a set-aside of funds, pending further order of this Court, for J.J. Manning's fee, marketing and auction costs.

10. The Debtor is further authorized to pay, in good funds from the Sale proceeds, the following undisputed liens or claims held against the Debtor and her non-debtor spouse at the Closing: (a) the UBS Mortgage to satisfy the Note and the Mortgage; and (b) the Shem Creek Mortgage to satisfy the Note and the Mortgage. The Debtor shall immediately place the remaining Sale

Proceeds in a segregated escrow account at Reid & Riege P.C. or other facility satisfactory to this Court.

11. Within seven (7) days of the Closing, the Debtor shall file upon this Court's docket a "Certificate of Closing" specifying the Closing's date, time, and place and attach a Closing Statement summarizing the gross Sale proceeds, any adjustments, and any disbursements made at or connected to the Closing, and the amount of the net proceeds to be held in escrow pending further order(s) of this Court.

12. This Order: (a) is and shall be effective at Closing as a determination that all Liens existing as to the Property have been, and hereby are, adjudged and declared to be unconditionally released, discharged, and terminated as of the Closing, and (b) shall be binding upon and govern the acts of all entities, including: all filing agents and officers; title agents and companies; mortgage and deed recorders; registrars of deeds; administrative agencies or units; governmental departments of units; Secretaries of State; federal, state, and local officials; and all other persons or entities who may be required by operation of law, duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who are required to report or insure any title or state of title in or to the Property conveyed to D-Trust. All recorded Liens as of this Order's entry date shall be forthwith removed and stricken as against the Property. All such entities described above in this paragraph are authorized and specifically directed to

strike all such recorded Lienor Interests against the Property from their records, official and otherwise.

13. The Debtor shall file this Order on the Town of Westerly, Rhode Island's Land Records within seven (7) days of the Closing to provide record notice of the title transfer of the Property to D-Trust and to unconditionally release, discharge, and terminate any Interest to the Property as of the Closing date.

14. Effective on the Order's entry date, except as otherwise expressly provided in the Sale Agreement, all entities with notice of the Complaint and their respective successors or assigns, shall be permanently and forever barred, restrained, and enjoined from commencing or continuing any action or other proceeding of any kind against D-Trust or its successors, assigns, officers, directors, affiliates, or shareholders, as the alleged successors or otherwise, with respect to any Interests arising out of or related to the Property, the Debtor, or her Chapter 11 bankruptcy estate before the Closing or the Sale.

15. The Sale contemplated hereunder shall not be avoidable under 11 U.S.C. § 363(n).

16. The failure to include specifically any particular provisions of the Sale Agreement(s) in the Order shall not diminish or impair the efficacy of such provision, it being the Court's intent that the Sale Agreement(s) and each and every provision, term, and condition thereof is authorized and approved in its entirety, provided however that the Sale Agreement(s) may be modified, amended, or supplemented by the parties thereto in a writing signed by all parties without further Court order, provided that any such modification,

amendment, or supplementation does not have a materially adverse effect on the Chapter 11 bankruptcy estate.

17. To the extent that there is a conflict between the provisions of this Memorandum of Decision ("Order") and the Sale Agreement(s), this Order and the Judgment related thereto shall prevail.

18. This is a final order and is enforceable upon its entry, and to the extent necessary under FRBP 5003, 9014, 9021, and 9002, the Court finds that there is no good reason for delay in implementing this Order and expressly directs judgment entry as set forth herein. The stay imposed by FRBP 6004(h) and 7062 is hereby modified for good and compelling cause, including the risks of diminution of the Chapter 11 bankruptcy estate and loss of a favorable sale transaction, and shall not apply to the Judgment and the Order, and the Debtor is hereby authorized and directed to promptly consummate and close the Sale.

## V.   COURT'S JURISDICTIONAL RETENTION

It is necessary and appropriate for this Court to retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Order, Judgment and the Sale Agreement(s), all amendments thereto, any waivers and consents thereunder, and each of the documents executed in connection therewith in all respects, including to: (i) compel the Property's delivery to D-Trust; (ii) resolve any matters or disputes that arise or relate to the Sale Agreement's implementation by this Court; and (iii) resolve any disputes regarding liens, claims, interests, or encumbrances asserted against the Property.

Accordingly, Judgment on the Amended Complaint in favor of the Debtor shall separately enter upon the docket.

**IT IS SO ORDERED** at Hartford, Connecticut this 13th day of April 2020.

James J. Tancredi
United States Bankruptcy Judge
District of Connecticut